**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION - CINCINNATI**

| | | |
|---|---|---|
| CINCINNATI BELL EXTENDED TERRITORIES LLC d/b/a altafiber, | : | Case No. 1:25-cv-871 |
| | : | Judge Matthew W. McFarland |
| Plaintiff, | : | |
| v. | : | |
| SINCLAIR TELEVISION GROUP, INC, et al., | : | |
| Defendants. | : | |

---

## ORDER AND OPINION

---

This matter is before the Court on Defendant Deerfield Media (Cincinnati) Licensee, LLC's Motion to Dismiss (Doc. 9) and Defendant Sinclair Television Group, Inc.'s Motions to Strike Jury Demand (Docs. 17, 20). Both Motions have been fully briefed. (*See* Docs. 14, 18, 22, 25, 26, 28.) Thus, these matters are ripe for the Court's review. For the following reasons, Deerfield's Motion (Doc. 9) is **DENIED**. Sinclair's Motions (Docs. 17, 20) are **GRANTED**.

## FACTS AS ALLEGED

### I. The Parties and Agreements

This case centers on licensing agreements between Plaintiff Cincinnati Bell Extended Territories, LLC ("Altafiber") and Defendants Sinclair Television Group, Inc. ("Sinclair") and Deerfield Media (Cincinnati) Licensee, LLC ("Deerfield"). Altafiber provides cable television services in the Cincinnati Neilsen Designated Market Area

("Cincinnati DMA"). (Compl., Doc. 7, ¶ 6.) Sinclair, a broadcast television services owner, acquired television station WSTR, a Cincinnati DMA television station, in 1996. (*Id.* at ¶¶ 7, 12.) Later, in 2012, Sinclair contracted to acquire WKRC, another Cincinnati DMA television station, but FCC rules prohibited Sinclair from directly owning both WSTR and WKRC at the same time. (*Id.* at ¶ 13.) So, Sinclair created Deerfield to hold the WSTR license on behalf of Sinclair. (*Id.* at ¶ 14.) Sinclair then announced the sale of WSTR's license assets to Deerfield Media, Inc., ("Deerfield Parent"), the parent company of Deerfield. (*Id.* at ¶ 16.) Deerfield Parent financed the purchase using a loan guaranteed by Sinclair. (*Id.*) This transfer was meant to be a temporary measure until FCC regulations changed to allow Sinclair to hold both WSTR and WKRC directly. (*Id.* at ¶ 17.) Accordingly, Deerfield and Sinclair executed an option agreement ("Option Agreement") where Sinclair could repurchase the license assets or equity of Deerfield at a predetermined price. (*Id.*)

Besides the license transfer, Sinclair retained all other tangible and intangible assets of WSTR, including the tower, transmitter, studio, cameras, production equipment, offices, news vehicles, advertising relationships, and goodwill. (Compl., Doc. 7, ¶ 18.) It leased the tangible assets to Deerfield. (*Id.*) Deerfield had no staff, so Sinclair maintained management and operational control over WSTR through the Shared Services Agreement, which provided managerial services, and the Joint Sales Agreement, which provided advertising sales services. (*Id.* at ¶ 20.) Altafiber alleges that the Option Agreement, Shared Services Agreement, and Joint Sales Agreement "make clear that Deerfield was nothing more than a shell of Sinclair established for the sole purpose of

holding WSTR's broadcast license" until the FCC's regulations changed. (*Id.* at ¶ 21.) For SEC reporting purposes, Sinclair was required to treat Deerfield as a wholly-owned subsidiary and consolidate its financial results as a variable interest equity. (*Id.* at ¶ 23.)

Meanwhile, as a cable television operator, Altafiber must obtain the right to retransmit the signals of broadcast television stations. (Compl., Doc. 7, ¶ 28.) To comply with this requirement and retransmit WSTR, Altafiber entered into a series of Retransmission Consent Agreements with Deerfield, the most recent of which was made effective on January 1, 2024 ("Deerfield RTA"). (*Id.* at ¶ 29.) The Deerfield RTA gives Altafiber the right to transmit WSTR to its subscribers through December 31, 2026, and sets the terms and conditions governing Altafiber's retransmission for the duration of the Term. (*Id.* at ¶ 30.) Altafiber agreed to pay Deerfield a per-subscriber monthly fee for the retransmission of its signal stream and also agreed that, in addition to the primary stream, it would retransmit one multicast stream with no additional fee. (*Id.* at ¶¶ 31-32.) The Deerfield RTA directs Altafiber to make all payments to the Treasury Department of Sinclair Television Group, Inc. (*Id.* at ¶ 33.) Under the Deerfield RTA, early termination of the agreement is permitted "only in the event of a material misrepresentation, failure of warranty, or failure to perform a material term of the agreement." (*Id.* at ¶ 36.)

At the same time, Sinclair entered into a Retransmission Consent Agreement ("Sinclair RTA") with the National Cable Television Cooperative, Inc. ("NCTC"), a buying cooperative of cable service providers. (Compl., Doc. 7, ¶ 37.) The Sinclair RTA, effective January 1, 2024, permitted NCTC's participating members to retransmit the signals of stations owned by Sinclair. (*Id.*) Altafiber, a member of NCTC, executed a

Member Participation Agreement and became a participating member of the Sinclair RTA. (*Id.*) In the Sinclair RTA, which expires on December 31, 2026, Sinclair identified WKRC as the only station in the Cincinnati DMA eligible for retransmission. (*Id.* at ¶¶ 37, 39.) Sinclair did not identify WSTR as an eligible station. (*Id.* at ¶ 40.) For these eligible stations, participating members, like Altafiber, agreed to pay Sinclair the monthly rates set forth in the Sinclair RTA. (*Id.* at ¶ 41.) However, the per-subscriber monthly rates for a MyNetwork-affiliated station, like WSTR, were about six times higher than the rate for WSTR in the Deerfield RTA. (*Id.* at ¶ 42.) The Sinclair RTA imposes additional obligations that do not exist in the Deerfield RTA. (*Id.*) Additionally, the Sinclair RTA allows Sinclair to add new eligible stations after its effective date. (*Id.*) Altafiber alleges that, if Sinclair already owned or managed a station for which it sought to have the RTA govern the retransmission, it was required to identify that station as an eligible station at the time of contracting, though. (*Id.* at ¶ 43.) And, any previous retransmission agreement with one of these newly eligible stations would be terminated. (*Id.* at ¶ 44.)

## II. Sinclair's Reacquisition of WSTR

The issues surrounding this case arose on August 18, 2025, when Sinclair exercised its rights under the Option Agreement and paid $5.15 million to Deerfield for the WSTR license (the "Reacquisition"). (Compl., Doc. 7, ¶ 45.) This price fell "well below" the fair market value of the license assets, according to Altafiber. (*Id.*) Because Sinclair already owned all or substantially all of the operational assets of WSTR, the Reacquisition did not transfer any other assets; nor did it alter any aspect of control or management, as Sinclair had managed and controlled WSTR during the relevant times. (*Id.* at ¶ 46.) The same day,

Sinclair notified NCTC of its acquisition of three stations from Deerfield and asserted that WSTR was now governed by the terms of the Sinclair RTA as a new eligible station. (*Id.* at ¶ 47.) Under the Sinclair RTA, Sinclair claimed, any prior retransmission consent agreements between Altafiber and WSTR were terminated. (*Id.* at ¶ 48.) And, Sinclair claimed that the Sinclair RTA requires Altafiber to carry two additional programming streams broadcast by WSTR and pay retransmission fees over six times higher than those required under the Deerfield RTA. (*Id.* at ¶ 49.) Altafiber estimates that these increased fees would result in approximately $2.1 million in additional costs to Altafiber through December 31, 2026. (*Id.*) Altafiber states that it has not received any notice from Deerfield regarding a change in WSTR's named licensee or any termination of the Deerfield RTA. (*Id.* at ¶ 50.)

On September 16, 2025, Altafiber sent Sinclair a letter objecting to Sinclair's attempt to terminate the Deerfield RTA and migrate Altafiber's rights to transmit WSTR to the Sinclair RTA. (Compl., Doc. 7, ¶ 51.) In the letter, Altafiber claimed that, while Sinclair "acquired" WSTR a month earlier, Sinclair had, in fact, continuously owned and controlled WSTR since 1996 and that Deerfield was merely a shell of Sinclair. (*Id.* at ¶ 52.) Sinclair, in response, did not comply with the terms of the Deerfield RTA and instead demanded that Altafiber pay the higher retransmission fees provided in the Sinclair RTA. (*Id.* at ¶ 53.) Altafiber alleges that it has been forced to pay these fees because, if it refused, Sinclair would likely claim that it breached the Sinclair RTA and, as a result, would cause Altafiber to lose its NCTC status. (*Id.* at ¶ 54.) This would, in turn, threaten Altafiber's ability to retransmit two other important broadcast stations. (*Id.*) So, Altafiber alleges that

it "has been compelled" to pay the higher rates to ensure uninterrupted carriage of these stations, resulting in damages "equal to at least the difference between the rates charged under the Deerfield RTA and those imposed under the Sinclair RTA." (*Id.* at ¶ 55, 57.)

**PROCEDURAL POSTURE**

Altafiber originally brought this lawsuit in the Hamilton County Court of Common Pleas. (*See* Notice of Removal, Doc. 1.) Defendants removed the case to this Court on November 26, 2025. (*Id.*) The Complaint, which includes a jury demand, brings six claims: (1) breach of contract as to the Sinclair RTA against Sinclair; (2) breach of contract as to the Deerfield RTA against both Deerfield and Sinclair; (3) breach of the implied covenant of good faith and fair dealing as to the Sinclair RTA against Sinclair; (4) breach of the implied covenant of good faith and fair dealing as to the Deerfield RTA against both Deerfield and Sinclair; (5) tortious interference as to the Deerfield RTA against Sinclair; and (6) declaratory judgment that the Deerfield RTA remains in effect. (Compl., Doc. 7, Pg. ID 188-93.) Sinclair answered the Complaint and filed a Counterclaim against Altafiber seeking declaratory judgment that the Deerfield RTA was terminated on August 18, 2025 and WSTR is a new eligible station under the Sinclair RTA. (Sinclair Answer, Doc. 10, Pg. ID 218.) Deerfield, meanwhile, moved to dismiss the claims against it. (Motion, Doc. 9.) Altafiber answered Sinclair's Counterclaim and filed a Demand for Trial by Jury as to the Counterclaim. (Altafiber Answer, Doc. 15.) Thereafter, Sinclair moved to strike both the Complaint's jury demand and the jury demand for the Counterclaim. (*See* Motions to Strike, Docs. 17, 20.)

**LAW AND ANALYSIS**

**I. Motions to Strike**

The Court begins by addressing Sinclair's Motions to Strike Altafiber's jury demands. (Docs. 17, 20.) In Sinclair's first Motion to Strike, it asks that the Court strike the jury demand in Altafiber's Complaint because it "directly contravenes its contractual waiver" found in the Sinclair RTA. (Motion, Doc. 17, Pg. ID 318.) In support of this position, Sinclair argues that the Sinclair RTA contains a clear, unambiguous, and prominently stated jury-trial waiver. (*Id.*) And, courts in the Sixth Circuit routinely hold up such waivers. (*Id.* (citing *K.M.C. Co. v. Irving Tr. Co.*, 757 F.2d 752, 755-56 (6th Cir. 1985)).) Sinclair claims that the waiver "applies to all matters hereunder," and that extends to all of Altafiber's claims. (*Id.* at Pg. ID 319.)

In response, Altafiber first notes that Deerfield does not join in Sinclair's Motion to Strike. (Response, Doc. 22, Pg. ID 432.) To this point, Altafiber argues that the jury waiver in the Sinclair RTA does not apply to claims against Sinclair arising from the Deerfield RTA. (*Id.* at Pg. ID 433.) These claims include a breach of contract claim for the Deerfield RTA, a breach of the implied covenant of good faith and fair dealing claim for the Deerfield RTA, and a declaratory judgment claim seeking a declaration that the Deerfield RTA remains in effect. (*Id.*) Altafiber argues that the jury waiver in the Sinclair RTA applies to "all matters hereunder," and the Sixth Circuit has interpreted the term "hereunder" to mean "in accordance with this document." (*Id.* at Pg. ID 433-34 (quoting *Nichols v. Stat Radiology Med. Corp.*, No. 21-1560, 2022 WL 874312, at *3-4 (6th Cir. Mar. 24, 2022)).) Thus, "the term limits the scope of the clause to claims arising from the parties'

agreement." (*Id.* at Pg. ID 434 (quoting *Nichols*, 2022 WL 847312, at *8).) It follows, according to Altafiber, that "[c]laims under the Deerfield RTA plainly do not arise under the Sinclair RTA," and "courts routinely decline to apply jury waivers to claims arising under different contracts." (*Id.* (collecting cases).)

Additionally, Altafiber argues that the jury waiver does not apply to its tortious interference claim against Sinclair. (Response, Doc. 22, Pg. ID 435.) Courts in this circuit have held that "contractual jury waivers extend to tort claims when the claim 'would not exist were it not for the contractual relationship between the parties.'" (*Id.* (quoting *JPMorgan Chase Bank, N.A. v. Winget*, No. 08-13845, 2017 WL 6059274, at *2 (E.D. Mich. Dec. 7, 2017)).) But here, Altafiber notes, the "tortious interference claim exists regardless of the contractual relationship" between itself and Sinclair. (*Id.*) And, "federal courts have often found that tortious interference claims for interference with separate contracts do not fall within the scope of the jury waiver." (*Id.* (collecting cases).) Moreover, Altafiber maintains that the Motion to Strike the jury demand in its entirety fails because Sinclair lacks standing to move to strike Altafiber's jury demand against Deerfield, as Deerfield did not join in the Motion. (*Id.* at Pg. ID 436 (collecting cases).)

Finally, Altafiber stipulates that Counts 1 and 3, which directly address the Sinclair RTA, are not triable by jury. (Response, Doc. 22, Pg. ID 436.) Altafiber also notes that it had previously offered to withdraw the jury demand with respect to these claims "in an effort to obviate the need for Court intervention," but Sinclair did not respond to this offer. (*Id.*) To that end, though, the Court finds that, given the jury waiver in the Sinclair RTA, along with Altafiber's stipulation, the jury demand as applied to Counts 1 and 3

shall be stricken.

Nevertheless, Sinclair insists that the jury waiver still applies to Counts 2, 4, 5, and 6. (Reply, Doc. 26, Pg. ID 527.) On this point, Sinclair states the courts in this circuit "do not confine jury waivers to claims formally labeled as breach-of-contract claims," but instead, "they apply waivers to disputes that are factually and legally intertwined with, or dependent on, rights created by the contract." (*Id.*) And, a "nonsignatory to a contract may invoke a valid contractual jury waiver provision where the nonsignatory's claims arise out of and relate to an agreement." (*Id.* (citing *SBAV LP v. Porter Bancorp, Inc.*, No. 3:13-CV-710, 2014 WL 1922874, at *3 (W.D. Ky. May 14, 2014)).) Sinclair thus argues that the inquiry here is functional: "whether adjudication of the claim requires interpretation, enforcement, or determination of rights created by the agreement containing the waiver." (*Id.* at Pg. ID 528.) While Altafiber insists that the term "hereunder" limits the waiver to only those formally arising under the Sinclair RTA, Sinclair claims that Altafiber improperly relies on its case law in reaching this conclusion. (*Id.* at Pg. ID 528-89.) First, Sinclair points out that *Nichols* involved an indemnification clause and not a jury waiver. (*Id.* at Pg. ID 529.) And, Altafiber relies on an out-of-circuit case, *Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.3d 1458, 1464-65 (9th Cir. 1983), which addressed the scope of an arbitration clause. (*Id.*) Regardless, other courts have declined to follow the holding in *Mediterranean Enterprises* and have instead found that tort claims were covered by arbitration clauses where the claims arose from and required interpretation of the underlying statement. (*Id.* (collecting cases).) In sum, Sinclair maintains that Counts 2, 4, and 6, which involve the Deerfield RTA, "seek to invalidate Sinclair's reliance on the

Sinclair RTA," so adjudicating those claims "necessarily requires determining whether the Sinclair RTA authorized Sinclair's actions." (*Id.*) The claims thus are matters "hereunder" for purposes of the jury waiver. (*Id.*) And, Count 5 "depends on whether Sinclair was contractually entitled to act as it did." (*Id.*) Therefore, Sinclair reiterates that all claims fall within the jury waiver in the Sinclair RTA.

Finally, Sinclair addresses the standing issue by clarifying that it does not move on behalf of Deerfield, but rather to "protect its own rights under the Sinclair RTA." (Reply, Doc. 26, Pg. ID 531.) Put differently, Sinclair is "entitled to enforce [the Sinclair RTA] waiver as to claims that fall within" its scope. (*Id.*) Further, Sinclair states that Altafiber's cited cases are inapposite because, in those cases, "the moving party lacked a direct personal interest in the right being asserted." (*Id.*)

Neither party disputes the validity of the jury waiver in the Sinclair RTA, so the Court operates under the assumption that it was knowingly, voluntarily, and unambiguously made. *See K.M.C.*, 757 F.2d at 755. The Court moves on to whether it applies to claims arising under the Deerfield RTA. On this point, the Court finds Sinclair's reasoning persuasive. "District courts within the Sixth Circuit have generally concluded that, when claims relate to the contract, and also arise out of the contract containing a jury waiver, the jury waiver applies to such claims." *CommonSpirit Health v. HealthTrust Purchasing Grp., L.P.*, No. 3:21-CV-460, 2022 WL 617113, at *4 (M.D. Tenn. Mar. 2, 2022) (collecting cases). Here, "all of the acts complained of, whether couched in contract or tort, arose out of [Sinclair]'s action or inaction in abiding by the terms" of the Sinclair RTA. *Fort Henry Mall Owner, LLC v. U.S. Bank N.A.*, No. 2:11-CV-287, 2012 WL 523657, at

*4 (E.D. Tenn. Feb. 15, 2012). Put more simply, the Sinclair RTA creates a contractual relationship between Sinclair and Altafiber. But for the Sinclair RTA, Altafiber would have no claims relating to the Deerfield RTA against Sinclair. And, more specifically addressing the tort claim, "where tort claims arise out of and relate to the contract containing the jury waiver, the jury waiver clause applies to those claims as well." *CommonSpirit Health*, 2022 WL 617113, at *5 (quoting *SBA V LP*, 2014 WL 1922874, at *2). While Altafiber claims that the term "hereunder" restricts the jury waiver to only claims directly stemming from the Sinclair RTA, the Court finds that its claims against Sinclair related to the Deerfield RTA too stem directly from Sinclair's obligations under the Sinclair RTA. Thus, the Sinclair RTA jury waiver applies to all claims against Sinclair.

Similarly, in the second Motion to Strike, Sinclair asks that the Court strike the jury demand Altafiber made for all issues raised by Sinclair's Counterclaim, which also arise from the Sinclair RTA. (Motion, Doc. 20, Pg. ID 423.) Altafiber responds similarly by stating that the Counterclaim involves only the Deerfield RTA and thus does not implicate the Sinclair RTA. (Response, Doc. 25, Pg. ID 517.) However, Sinclair points out that "the Court cannot resolve [the Counterclaim] without interpreting and enforcing the rights and obligations" in the Sinclair RTA. (Reply, Doc. 28, Pg. ID 619-620.) Indeed, Altafiber's "effort to isolate the Deerfield RTA ignores the integrated contractual framework governing the parties' relationship." (*Id.* at Pg. ID 620.) And, just as with the jury waiver's application to the Complaint, the Court finds here that the Counterclaim does directly implicate Sinclair's "action or inaction in abiding by the terms" of the Sinclair RTA. *See Fort Henry Mall Owner, LLC*, 2012 WL 523657, at *4. The Counterclaim

"would not exist were it not for the contractual relationship between the parties," a relationship governed by a contract with a valid jury trial waiver. *Winget*, 2017 WL 6059274, at *2. Thus, the Court finds that the jury waiver applies to the Counterclaim as well; the jury demand shall be stricken.

## II. Motion to Dismiss

Having addressed Sinclair's Motions to Strike, the Court now examines Deerfield's Motion to Dismiss (Doc. 9). Specifically, Deerfield moves to dismiss the two claims Altafiber brings against it: Count 2, breach of contract, and Count 4, breach of the implied covenant of good faith and fair dealing. (Motion, Doc. 9, Pg. ID 201.) Thus, the Court will begin by addressing the breach of contract claim and then will examine the claim for breach of the implied covenant of good faith and fair dealing. The Court notes that, per the Deerfield RTA, New York law governs these claims. (*See* Motion, Doc. 9, Pg. ID 202; Response, Doc. 14, Pg. ID 228, n.1.) However, "[w]ith respect to matters of pleadings and procedure, the Federal Rules of Civil Procedure apply, rather than the law of the state. *Van-Am. Ins. Co. v. Schiappa, et al.*, 191 F.R.D. 537, 541 (S.D. Ohio 2000) (citing *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir.1994)).

Turning first to the breach of contract claim, Deerfield indicates that, to properly state the claim, "the plaintiff must identify the essential terms of the contract, including a specific provision of the contract that was breached." (Motion, Doc. 9, Pg. ID 201 (quoting *Clemmons v. Upfield US, Inc.*, 667 F. Supp. 3d 5, 19 (S.D.N.Y. 2023)).) However, Deerfield maintains that Altafiber "halfheartedly" makes its breach of contract claim because the Complaint "points to no contractual provision [in the Deerfield RTA] that Deerfield

breached." (*Id.* at Pg. ID 201-02.) Rather, Deerfield argues, the RTA terms "were simple—Deerfield would permit [Altafiber] to retransmit the WSTR signal, and [Altafiber] would pay Deerfield a fee in exchange." (*Id.* at Pg. ID 202.) So, when Deerfield sold the WSTR license back to Sinclair, "it took itself out of the picture," but there is no contractual provision in the Deerfield RTA prohibiting this sale. (*Id.*) And, Deerfield argues, Altafiber does not allege that Deerfield in any other way "failed to uphold its end of the bargain." (*Id.*)

In its Response, Altafiber first notes that it has alleged the breach of a specific contractual provision: Deerfield did not honor the provisions of the contract by failing to charge the agreed-upon price. (Response, Doc. 14, Pg. ID 231.) Then, Altafiber argues that Deerfield ignores the allegation that Deerfield is liable for Sinclair's breaches of the Deerfield RTA under the theory of alter ego liability. (*Id.*) It supports this argument with "well-settled New York law that 'a plaintiff may allege breach of contract and then in that cause of action attempt to extend liability to another party based on the theory of alter ego.'" (*Id.* (quoting *Mediapro US Production Services, LLC v. A1 Padel, LLC*, No. 654337/2024, 2025 WL 1425440, at *2 (N.Y. Sup. Ct. May 15, 2025)).) Further, courts have affirmed denial of motions to dismiss "challenging alter ego allegations when the complaint includes sufficient facts alleging defendants commingled funds and disregarded corporate formalities." (*Id.* (collecting cases).) Additionally, Altafiber points out that this Court has recognized that the question of whether one entity is an alter ego of another is "fact-sensitive" and should not be answered until after discovery. (*Id.* at Pg. ID 231-32 (collecting cases).) To that end, Altafiber notes that Deerfield does not dispute

the adequacy of its allegations that Sinclair breached the Deerfield RTA "by improperly terminating and prematurely terminating the Deerfield RTA and by migrating [A]ltafiber's rights to retransmit WSTR to the Sinclair RTA." (*Id.* at Pg. ID 232 (quoting Compl., Doc. 7, ¶ 68).) And, the Complaint is full of allegations "supporting a plausible inference that Deerfield and Sinclair [...] operated in effect as a single entity." (*Id.* (citing Compl., Doc. 7, ¶¶ 12-27).) Thus, Altafiber maintains that it has properly pled a breach of contract claim against Deerfield under the theory of alter ego liability. (*Id.*)

Altafiber continues its Response by arguing that it alleged that it has not received any notice from Deerfield regarding a change in the named licensee for WSTR. (Response, Doc. 14, Pg. ID 232.) "In other words," Altafiber states, Deerfield never notified Altafiber that it had "assigned the Deerfield RTA (or any rights or obligations thereunder) to Sinclair." (*Id.*) So, if Sinclair never validly assigned the Deerfield RTA, then Deerfield "is still bound by its terms and directly liable for its premature and improper termination." (*Id.*) The question of whether the assignment was valid is "thus a material question of fact that requires discovery, regardless of whether Deerfield and Sinclair are alter egos." (*Id.*)

In its Reply, Deerfield focuses on the alter ego theory of liability, stating that the theory does not apply here. (Reply, Doc. 18, Pg. ID 325.) Rather, in order to establish alter ego liability, a plaintiff "must satisfy a demanding two-part test," wherein it must show that the owner exercised "complete domination" of the other entity. (*Id.*) Deerfield maintains that Altafiber merely alleges that Sinclair "delegat[ed] duties," which "does not constitute complete domination under any reasonable definition." (*Id.*) And, Deerfield argues that Altafiber failed to allege a "wrong or fraud" on Deerfield's part that

caused Altafiber injury to justify piercing the corporate veil. (*Id.* at Pg. ID 325-26.)

The Court, though, is not persuaded by this argument at this juncture. Deerfield is correct that courts in New York require the plaintiff to "allege facts that, if proved, indicate that the parent or alter ego exercised complete domination of the corporation." *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Allure Metal Works, Inc.*, 176 N.Y.S.3d 111, 113 (N.Y. App. Div. 2022). However, to allege this at the motion to dismiss stage, some courts have found sufficient any allegations of shared common officers, occupation of business premises, acquisition of equipment and employees, and similarity of the business. *Id.* Other courts have denied a motion to dismiss, finding the complaint sufficient when it alleged that the alter ego was owned and controlled by the parent and was created to hold an interest of the corporation. *Villnave Constr. Servs., Inc. v. Crossgates Mall Gen. Co. Newco, LLC*, 161 N.Y.S.3d 480, 488 (N.Y. App. Div. 2022). Indeed, the court in *Villnave* found that the "fact-laden claim to pierce the corporate veil is unsuited for resolution on a pre-answer, pre-discovery motion to dismiss." *Id.*

Examining the allegations here, Altafiber states that: Sinclair created Deerfield solely to hold its license for WSTR; Sinclair "effectively owned and exercised operational control over WSTR through Deerfield"; Deerfield's founder was an agent of Sinclair; Sinclair guaranteed the loan used to finance Deerfield's purchase of the WSTR license; Deerfield had no independent staff to operate WSTR, so Sinclair maintained management and operational control over it; Sinclair could unilaterally renew the Option Agreement indefinitely, while Deerfield lacked any ability to terminate it; Deerfield used Sinclair's attorneys to "negotiate" the agreements between the two; and Sinclair was required, for

SEC reporting purposes, to treat Deerfield as a wholly-owned subsidiary and consolidate its financial results as a variable interest entity. (Compl., Doc. 7, ¶¶ 1-23.) The Court finds that these allegations more than sufficiently plead alter ego liability. Any further analysis of whether Sinclair truly maintained "complete domination" over Deerfield would be inappropriately addressed at this stage of litigation. *See Villnave*, 161 N.Y.S.3d at 488. The breach of contract claim is thus properly pled against Deerfield under the theory of alter ego liability. Furthermore, Deerfield is incorrect that Altafiber has not alleged a wrong that caused Altafiber an injury; indeed, Altafiber specifically alleges that Deerfield and/or Sinclair breached the contract, causing Altafiber to pay over $2.1 million more in fees. (Compl., Doc. 7, ¶ 69.) Count 2 thus states a claim on which relief can be granted.

The Court now turns to the claim for breach of implied covenant of good faith and fair dealing. Deerfield contends that this claim must be dismissed because Altafiber knew the terms of the 2012 transaction between Sinclair and Deerfield as it was filed with the FCC and was publicly available. (Motion, Doc. 9, Pg. ID 203.) Thus, Altafiber "cannot knowingly benefit from a contract with Deerfield and then allege that Deerfield's very existence constitutes bad faith."(*Id.*) And, "Sinclair's exercise of the option to repurchase the WSTR license" was not an act of bad faith but was "mandated by the terms of the agreement" of which Altafiber was aware. (*Id.*)

In response, Altafiber finds two issues with Deerfield's argument. First, Altafiber reiterates that the alter ego allegations also apply to Count 4, "such that Sinclair's alleged breaches of the implied covenant inherent in the Deerfield RTA—which have not been challenged—can be imputed to Deerfield." (Response, Doc. 14, Pg. ID 233.) Second, New

York law recognizes that the implied covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." (*Id.* (citing Motion, Doc. 9, Pg. ID 203).) Altafiber asserts that the Complaint alleges precisely this conduct: "that Deerfield and Sinclair engaged in a bad faith scheme to, among other things, deprive Altafiber of the benefit of its express bargain under the Deerfield RTA." (*Id.*) Put differently, Altafiber states that "Defendants' actions frustrated Altafiber's legitimate expectations that it would be paying the rates set forth in the Deerfield RTA [...], as opposed to the higher rates in the Sinclair RTA." (*Id.*) And, Altafiber notes that Deerfield's only argument "is its own factual allegation that [A]ltafiber knew or should have known about Sinclair's sale," and the accompanying Option Agreement. (*Id.*) But, Altafiber points out that these are "disputes of fact that are not supported by allegations in the Complaint and cannot be considered on a motion to dismiss." (*Id.* (citing *DuBrul v. Citrosuco N. Am., Inc.*, 892 F. Supp. 2d 892, 916, n.12 (S.D. Ohio 2012)).)

In its Reply, Deerfield's argument seemingly focuses on the inapplicability of the alter ego theory. (Reply, Doc. 18, Pg. ID 325.) But, as the Court has already established, Altafiber properly pleads allegations sufficient to present a theory of alter ego liability in its Complaint; dismissal at this stage would be inappropriate. *See Villnave,* 161 N.Y.S.3d at 488. And, to the extent that Deerfield argues a lack of injury (*see* Reply, Doc. 18, Pg. ID 325-26), Altafiber properly pleads damages in the amount of about $2.1 million as a result of Deerfield and Sinclair's breach of implied covenant and fair dealing. (*See* Compl., Doc. 7, ¶ 83.) Thus, the Court finds that Altafiber has sufficiently pled its claim for breach of

implied covenant against Deerfield. Dismissal is not warranted.

## CONCLUSION

For the foregoing reasons, the Court **ORDERS** the following:

1. Sinclair's Motion to Strike Jury Demand of the Complaint (Doc. 17) is **GRANTED** for all claims against Sinclair;
2. Sinclair's Motion to Strike Jury Demand of the Counterclaim (Doc. 20) is **GRANTED**; and
3. Deerfield's Motion to Dismiss (Doc. 9) is **DENIED**.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: Matthew W. McFarland

JUDGE MATTHEW W. McFARLAND